IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 08-cv-02612-WYD-MEH

JAMES K. CONKLETON,

     Plaintiff,

v.

ED MURO, in his individual capacity as a Correctional Officer I for the CDOC,
RICHARD DEGROOT, in his individual capacity as a Case Manager for the CDOC,
THOMAS MISEL, in his individual capacity as Case Manager Supervisor, CDOC, and
RICHARD LIND, in his individual capacity as a Correctional Officer V,

     Defendants.[1]

---

## RECOMMENDATION ON MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Defendants' Motion for Summary Judgment [filed August 25, 2010; docket #156].  Pursuant to 28 U.S.C. § 636(b)(1)(B) and D.C. Colo. LCivR 72.1C, the matter is referred to this Court for recommendation [docket #157].  The motion is fully briefed,[2] and oral argument would not materially assist the Court in its adjudication.  For the reasons that follow, the Court RECOMMENDS that the motion be **granted in part and denied in part**.[3]

---

[1]The caption is amended in accordance with Judge Daniel's March 15, 2010 order.  Docket #133.

[2]Although granted an extension of time within which to file a reply in support of its motion (docket #169), Defendants did not file a reply brief.  Defendants confirmed at the Final Pretrial Conference on October 28, 2010 that they determined not to file a reply, but to stand on their motion.

[3]Be advised that all parties shall have fourteen (14) days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned.  Fed. R. Civ. P. 72.  The party filing objections must specifically identify those findings or recommendations to which the objections are being made.  The District Court need not consider frivolous, conclusive or general objections.  A party's failure to file such written objections to

## BACKGROUND

**I.      Findings of Fact**

The Court finds the following facts, some of which are stipulated by the parties and the remainder viewed in the light most favorable to the Plaintiff, who is the non-moving party in this matter.

1.      Anthony DeCesaro is the Step Three Grievance Officer for the Colorado Department of Corrections (CDOC). DeCesaro investigates and answers all Step Three grievances filed by CDOC inmates. (Stipulated)[4]

2.      Grievance procedures for CDOC inmates are set forth in CDOC Administrative Regulation ("AR") 850-04, which provides a three-step grievance process. (Stipulated)

3.      To exhaust their administrative remedies, CDOC inmates are required to complete all three steps of the grievance process. (Stipulated)

4.      Pursuant to AR 850-04(IV)(B)(3)(a) (docket #156-1 at 9), each grievance shall address only one problem or complaint and include a description of the relief requested. A substantive issue may not be added to a later step if it has not been contained in each previous step of that particular grievance. (*Id.*; AR 850-04(IV)(B)(3)(b).)

---

proposed findings and recommendations contained in this report may bar the party from a de novo determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676-83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy may bar the aggrieved party from appealing the factual findings of the Magistrate Judge that are accepted or adopted by the District Court. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991).

[4]The term, "stipulated," refers to those facts stated by the Defendants in their motion and "admitted" by the Plaintiff in his response to the motion.

2

5.      Plaintiff filed a Step One grievance, No. FF 07/08-091, on September 11, 2007.  (CDOC

Offender Grievance Form, dated September 11, 2007, docket #156-1 at 17.)

6.      In this grievance, Plaintiff asserts that Defendant Muro had been harassing him for the past

two months. *Id.* He described the manner of harassment allegedly conducted by Muro.

Plaintiff stated the harassment had culminated in his being placed in segregation on August

24, 2007.  (Stipulated)

7.      Plaintiff filed a Step Two grievance, No. FF 07/08-091, on October 16, 2007 stating that

Muro threatened to have him placed in segregation to "hinder [his] legal access to the courts,

then followed through."  (Stipulated)

8.      Plaintiff did not raise the issue regarding access to courts in the previous Step One grievance.

(Stipulated)

9.      Plaintiff filed a Step Three grievance, No. FF 07/08-091, on November 29, 2007.  His Step

Three grievance contained allegations that Muro harassed him, that he was transferred to

another facility and that Muro verbally threatened him for his legal activity, "then followed

through with a plainly meritless attempt at conspiratorially planned disciplinary action."

(Stipulated)

10.     DeCesaro was not able to timely respond to a large number of Step Three grievances,

including the Step Three grievance No. FF 07/08-091 filed by Plaintiff.  (Affidavit of

Anthony DeCesaro, March 31, 2010, at ¶ 13, docket #156-1 at 3.)  As a result, he sent a

letter to Plaintiff on August 28, 2008 indicating the response Plaintiff received to his Step

Two grievance would serve as the final answer and final agency action.  (*Id.*; Attachment 5,

docket #156-1 at 20.)

11.     The Step One through Three grievances No. FF 07/08-091 are the only grievances DeCesaro

found in the CDOC grievance database containing complaints by Plaintiff against Muro and

Plaintiff's placement in segregation in August 2007.  (Stipulated)

12.     At all relevant times, Defendant Muro was a Correctional Officer at Fremont Correctional

Facility ("FCF").  (Stipulated)

13.     On or about August 22, 2007, Muro observed and overheard Plaintiff talking in the dining

hall.  (Stipulated)

14.     Subsequent to the incident in the dining hall, Muro and his supervisor, Lt. Fahey, contacted

Plaintiff in cell house #7 where Plaintiff was housed.  (Stipulated)

15.     Thereafter, Muro submitted an Incident Report identifying the incident as

"Advocating/Creating Facility Disruption" in the "Foodservice East Dining Room."

(Incident Report #145203, August 22, 2007, docket #156-2 at 5.)  Muro summarized the

incident as "I/M Conkleton, #108986, made incindiary [sic] comments in the chow hall in

the presence of other inmates: He was RFP'd."  More specifically, Muro detailed the

incident as follows:

On 8-21-07,[5] at approximately 1245 P.M., I/M Conkleton ... was heard by CO Muro,
making incendiary comments about Food Service staff. ... I/M Conkleton made the
comment that it doesn't take much to be a Correctional Officer! I, CO Muro,
overheard the comment ... and stepped next to the I/M. CO Muro told the I/M to stop
making comments about staff in the dining facility, or CO Muro would handcuff and
remove I/M.  I/M made an additional comment, then took his seat. CO Muro then
attempted to talk to I/M Conkleton in cell house #7. I/M Conkleton once again
became loud and argumentative, directly in front of the security control center. ...
This is the third such situation where I/M has become loud and argumentative. This

---

[5]While the attached "detailed report" by Muro states the incident occurred on August 21,
2007, the first page of the Incident Report lists August 22, 2007 at 12:45 p.m. as the date and time
of the incident.  *See* docket #156-2 at 5-6.

is the second such incident in the dining hall.

(*See id.* at 6.)  The report indicates that it was created August 22, 2007 at 1:33 p.m., and approved by the Shift Commander, Jay C. Hudson, on August 22, 2007 at 2:27 p.m.  (*Id.* at 5.)

16.     A "Department of Corrections Removal from Population" form was completed by a Shift Commander/Duty Officer on August 22, 2007 at 13:40 regarding the removal of Plaintiff from general population, or "segregat[ion] ... pending an ongoing investigation which may lead to either disciplinary charges or administrative segregation," for "facility disruption." (Docket #156-2 at 7.) The signature appears to read "J.Hudson."  (*Id.*)  Signatures approving the removal appear on the form by a Warden/Administrative Head and Classification Officer and are dated August 23, 2007.  (*Id.*)

17.     Shift commanders are authorized to "order the temporary removal of the offender from the general population and reassignment to a separate living area [4-4251] within the facility or another facility."  (AR 600-01(IV)(M), docket #156-3 at 15.)

18.     CDOC prisoners can be removed from the general population and placed in segregation if they are determined to be a threat to the safety of the facility.  (Stipulated)

19.     Muro claims that when he prepared the Incident Report, he had no knowledge Plaintiff would be removed from the general population.  (Affidavit of Edward Muro, April 15, 2010 ("Muro Affidavit"), ¶ 16, docket #156-2.)  Muro also contends that he had no further involvement with the incident subsequent to drafting the Incident Report.  (*Id.* at ¶ 14.)

20.     Plaintiff alleges that he was confronted in cell house #7 by Muro who told him that he was going to write a chronological report on the Plaintiff.  Plaintiff claims he responded saying

that he had had enough of Muro's harassment and was going to submit a grievance against Muro. Plaintiff contends Muro responded, "I'll bet you will be in segregation before you file a grievance on me," or words to that effect. (Plaintiff's Declaration in Support of Response to Defendant's Motion for Summary Judgment, September 30, 2010 ("Plaintiff's Declaration"), ¶ 6, docket #164 at 21.)

21.     Muro claims he has no recollection of Plaintiff ever stating he was going to file a grievance against Muro, and asserts he has no knowledge of any grievance filed against him by Plaintiff. (Muro Affidavit, ¶ 19.)

22.     On September 20, 2007, Defendant DeGroot, Case Manager, completed a Reclassification Custody Rating form (Reclassification Form), which states Plaintiff would be moved from FCF to Limon Correctional Facility (LCF). (Stipulated)

23.     DeGroot claims he completed the Reclassification Form because Offender Services recommended that Plaintiff be moved to LCF due to his status of being "in denial" regarding sex offender treatment. (Affidavit of Richard DeGroot, January 21, 2010 ("DeGroot Affidavit"), ¶ 9, docket #156-4.)

24.     The CDOC classified Plaintiff with a sex offender rating of "S-5D." (Stipulated) A CDOC inmate is rated as "S-5" if he or she has been convicted of a sex offense. (Affidavit of Paul Hollenbeck, April 1, 2010 ("Hollenbeck Affidavit"), ¶ 6, docket #156-5.) Inmates receive a "D" sub-code rating if they are in denial of their offense or do not otherwise meet the criteria for participating in the Sex Offender Treatment and Monitoring Program ("SOTMP"). (*Id.*)

25.     The SOTMP is a therapeutic treatment program for certain CDOC sex offenders. In 2007,

FCF was the main facility to provide the SOTMP to CDOC inmates. (Stipulated)

26.     Offender Services handles inmate classification and movement and ultimately determines where offenders are placed within the CDOC. (Hollenbeck Affidavit, ¶ 2, docket #156-5.)

27.     In September 2007, four other inmates were also transferred from FCF to other facilities for being rated "D" or otherwise failing to meet the requirements for participation in the SOTMP.[6]  (*Id.* at ¶ 10; Attachment 1 to Hollenbeck Affidavit.)

28.     DeGroot claims that Offender Services' recommendation that Plaintiff be moved to LCF was sent to DeGroot by e-mail prior to his completing the Reclassification Form on September 20, 2007.  (DeGroot Affidavit, ¶ 10, docket #156-4.)

29.     Plaintiff alleges that, by Defendants' own admission, neither a copy of the email to DeGroot nor a policy from Offender Services regarding issuing lists of prisoners to be transferred exist.  (Plaintiff's Declaration, ¶ 11, docket #164; Affidavit of Paul Hollenbeck, July 19, 2010, at 1-2, docket #164 at 36-37.)  Plaintiff claims that he was threatened with a transfer to LCF by DeGroot, and a few days after he turned in the grievance against Muro, he was moved to LCF.  (*Id.*)

---

[6]Defendants claim that eleven other inmates were transferred from FCF to other facilities due to their failure to participate in the SOTMP.  Motion for Summary Judgment, ¶ 36, docket #156 at 6.  However, upon review of the documents relied upon by Defendants, the Court notes there exist only seven Classification forms and accompanying Executive Assignment Orders.  Of those seven, only four Classification forms and Executive Assignment Orders reflect a transfer from FCF to another facility due to a "D" classification.  Docket #156-5 at 5-12.  One of the remaining Executive Orders lists "CI's at FCF" as a comment to the transfer (with no explanation for "CI") and the accompanying Classification form reflects comments by the case manager and committee chair to "retain at FCF," with no referral to Offender Services.  *Id.* at 13-14.  Another Executive Order lists no comments to the transfer and the accompanying Classification form, dated two months earlier, reflects a note by Offender Services to "retain at FCF."  *Id.* at 15-16.  The final Executive Order and accompanying Classification form reflect a transfer from Arrowhead Correctional Center to other facilities.  *Id.* at 17-18.

7

30.  On September 21, 2007, Defendant Misel, who was DeGroot's supervisor at the time, reviewed the inmate Reclassification Form completed by DeGroot.  (Stipulated)

31.  In reviewing Reclassification Forms, Misel's procedure at the time consisted of reviewing the Case Manager's comments and recommendations, as well as all of the objective factors contained on the form. These factors included the severity of an inmate's conviction, any prior convictions, any institutional violence over the past seven years, disciplinary history, escape history and number of years to parole eligibility.  (Stipulated)

32.  In addition, Misel would have reviewed the inmate's "M-code" (medical rating), "P-code" (psychological rating) and "S-code" (sex offender rating).  (Stipulated)

33.  Based on his review of Plaintiff's Reclassification Form, Misel approved DeGroot's recommendation that Plaintiff be moved from FCF to LCF.  (Affidavit of Thomas Misel, January 22, 2010 ("Misel Affidavit"), ¶ 10.)

34.  At that time, Plaintiff was rated as "close custody" due to his conviction for assaulting a staff member.  At the time of his transfer, both FCF and LCF held close custody offenders.  (*Id.* at ¶ 11; Hollenbeck Affidavit, ¶¶ 10, 13.)

35.  Pursuant to Administrative Regulation 600-01, a custody level refers to the degree of supervision an inmate requires. Ranging from low to high, inmates are rated as minimum, minimum-restricted, medium, close and administrative segregation. (Stipulated)

36.  Misel claims that, at the time he reviewed Plaintiff's Reclassification Form, Misel had no knowledge of the grievance filed by Plaintiff against Muro and had never met nor heard of Officer Muro.  (Misel Affidavit, ¶¶ 14-15.)

37.  Plaintiff claims that Misel reasonably should have known about his conflicts with DeGroot

and Muro because he attempted to notify him through the CDOC "kite" system, wherein Plaintiff sought help from Misel in obtaining a grievance form.  (Plaintiff's Declaration, ¶¶ 12-13.)

38. Plaintiff's movement history shows that he has been transferred to various other facilities, including Sterling Correctional Facility and Centennial Correctional Facility. (Stipulated)

39. Both Sterling Correctional Facility and Centennial Correctional Facility are level V facilities. Level V is the highest security level facility, which houses administrative segregation or below.  (Stipulated)

40. The "movement history" report for Plaintiff reflects that on September 25, 2007, Plaintiff was moved from FCF to LCF.  ("Query Movements" report, Docket #156-5 at 19.)  Plaintiff was moved from LCF Intake to LCF Unit 1 that same day.  (*Id.*)  Plaintiff was then moved from LCF Unit 1 to LCF Unit 2 on October 2, 2007.  (*Id.*)  On February 6, 2008, Plaintiff was moved from LCF Unit 2 back to LCF Unit 1.  (*Id.*)  On March 25, 2008, Plaintiff was placed in segregation, then on March 31, 2008, Plaintiff was moved from LCF to the Sterling Correctional Facility.  (*Id.*)

41. New inmate arrivals at LCF are initially housed in Unit 1, which is divided into A, B and C pods. Pod B is used for new arrivals at LCF, inmates in punitive segregation and some general population inmates. The average stay in Pod B for new arrivals is approximately seven days. Pods A and C contain general population inmates. (Stipulated)

42. At all relevant times, Lt. Piper was the Internal Classification Officer at LCF whose job duties included handling new inmate arrivals, placement and movement.  (Stipulated)

43. In placing inmates in specific housing units, Piper also handled "custody issues," which are

security issues between inmates, including threats of violence made by one inmate(s) against another inmate(s). (Stipulated)

44. While Piper was the Internal Classification Officer at LCF, he attended weekly meetings to discuss inmate custody issues. It was the practice at LCF to ensure inmates have no known custody issues with other inmates in the unit to which they are being moved.  (Affidavit of Anthony Piper,  April 7, 2010 ("Piper Affidavit"), ¶ 11, docket #156-8.)

45. Piper claims he has no recollection of any custody issues regarding Plaintiff being raised during these meetings.  (*Id.* at ¶ 12.)

46. Plaintiff claims that in the morning on February 6, 2008, Plaintiff personally spoke with Piper about threats of physical assault he was receiving from inmates in Unit 2 and Piper told Plaintiff to move from Unit 2 to Unit 1 that day.  (Plaintiff's Declaration, ¶¶ 15, 17.)

47. Plaintiff was moved from Unit 2 to Unit 1 on February 6, 2008.  (Docket #156-5 at 19.)

48. On February 14, 2008, an Executive Assignment Order was issued for Plaintiff's transfer from LCF to Sterling Correctional Facility ("SCF").  (Docket #164 at 32.)  However, Plaintiff was not transferred to SCF until March 31, 2008.  (Docket #156-5 at 19.)

49. At all relevant times, Defendant Lind was the Custody and Control Manager at LCF. (Stipulated)

50. Lind's job duties did not include determining specific housing unit assignments for inmates. (Affidavit of Randy Lind, March 31, 2010 ("Lind Affidavit"), ¶ 4, docket #156-7.)  Lt. Anthony Piper, the Internal Classification Officer, was in charge of inmate classification and placement at LCF.  (*Id.*)

51. Lind claims he does not have any specific recollection of the Plaintiff and has no recollection

10

of any interactions with him, or of his allegations against him in this action.  (*Id.* at ¶ 5.)  In addition, Lind asserts he has no recollection of any conversation with Plaintiff or with any other prisoner at LCF concerning Unit 1 being used to protect sex offenders.  (*Id.* at ¶ 6.)

52.     Lind asserts he attended a custody meeting every week to discuss inmate custody issues, but has no recollection of any custody issues regarding Plaintiff being raised during these meetings and no recollection of Plaintiff reporting any threat to his safety to Lind or to any other staff member while he was housed at LCF.  (*Id.* at ¶¶ 8-9.)

53.     Plaintiff claims that on March 24, 2008, Lind summoned Plaintiff to his office and told Plaintiff that Unit 1 was not going to be used to house sex offenders and that Plaintiff was going to be moved the next day to another unit.  (Plaintiff's Declaration, ¶ 14.)

54.     Plaintiff asserts that the next day, March 25, 2008, he was ordered to pack and move to Unit 5 from Unit 1.  *Id.* at ¶ 16.  When Plaintiff refused to move, he was taken first to medical, then to segregation that same day.  (Incident #191990 Report, filed by James Green, docket #164 at 33.)

55.     Lind claims he did not order Plaintiff to be moved from Unit 1 to Unit 5 on March 25, 2008, since it was not Lind's responsibility to assign inmates to specific housing units.  (Lind Affidavit, ¶ 10.)

56.     Unit 1 is a general population unit at LCF that houses inmates who have all types of convictions.  (*Id.* at ¶ 6.)

57.     The CDOC does not have protective custody for sex offenders or for any inmates. Sex offenders are housed amongst the general population in all CDOC facilities.  (Stipulated)

58.     If it becomes known that an inmate is a convicted sex offender amongst other inmates, this

would not necessarily lead to the inmate being transferred, unless the inmate can articulate an actual threat to his safety. This would include an inmate reporting to a CDOC staff member that he has been threatened with physical violence by another inmate(s) due to his sex offense conviction.  (Stipulated)

59.     If it is determined there is an actual threat to the inmate's safety, Piper and other CDOC staff members are trained to write a report and to take appropriate steps in an attempt to protect the inmate. These steps include separating the inmate from the other inmate(s) who is believed to pose a danger, initiating disciplinary charges if warranted, and/or moving the inmate being threatened so as to prevent the inmates from having contact with one another. (Piper Affidavit, ¶ 10.)

60.     In March 2008, Plaintiff indicated in a grievance that his sex offense conviction had been released by another offender to the inmate population. Plaintiff did not provide the name of this offender, nor did he state in the grievance that he was being specifically threatened by another inmate(s).  (Stipulated)

61.     Piper claims that he reviewed the CDOC's internal computer system that tracks reports written by staff members and found no reports, including confidential reports, written by Piper or any other staff member indicating that Plaintiff received any specific threats or that his safety was otherwise at issue while he was housed at LCF.  (Piper Affidavit, ¶ 14.)

62.     Piper recalls that Conkleton wished to stay in Pod B of Unit 1. However, inmates are not permitted to choose the units, pods or cells in which they live.  (Stipulated)

63.     Plaintiff was never housed in Unit 5 at LCF.  He was transferred to the Sterling Correctional Facility on March 31, 2008.  (Stipulated)

64.     While he was housed at LCF, Plaintiff was never assaulted.  (Stipulated)


**II.     Procedural History**

Plaintiff is a state prisoner currently incarcerated at the Fremont Correctional Facility in

Canon City, Colorado.  Plaintiff brought this action pursuant to Section 1983 of Title 42 of the

United States Code, asserting violations of the First, Fourth, Eighth, and Fourteenth Amendments.

(Docket #23 at 6.)  Plaintiff, proceeding *pro se*, initiated this suit on December 2, 2008; following

an order by the Court, he filed an Amended Complaint on March 2, 2009.  (*See* docket #23.)  In

essence, Plaintiff originally alleged seven claims that Defendants denied him access to mandatory

sex offender treatment, subjected him to involuntary bodily exposure and retaliatory transfers,

denied him reasonable access to the courts, and failed to protect him from the risk of assault.

In response to Plaintiff's Amended Complaint, Defendants filed a Motion to Dismiss in Part

as to Plaintiff's Claims One, Two, Three, Five, Six, and Seven, and Defendants DeGroot and Misel

filed an Answer to Plaintiff's Claim Four.  (Dockets #54, 55.)  Defendants also filed a Motion to

Dismiss Injunctive and Declaratory Judgment Claims as Moot.  (Docket #114.)  At Plaintiff's

request, the District Court dismissed Claims Five and Seven by Order of January 22, 2010.  (Docket

#125.)  Subsequently, the District Court dismissed Plaintiff's Injunctive and Declaratory claims as

moot, dismissed Claims One and Two, and dismissed Claim Three in part.  (Docket #133.)

Thereafter, the District Court denied Plaintiff's Motion for Partial Summary Judgment on Claim

Four.  (Docket #151.)  Consequently, Plaintiff's remaining claims in this action are Claim Three (in

part) alleging retaliatory placement in segregation against Defendant Muro, Claim Four alleging

retaliatory transfer against Defendants DeGroot and Misel, and Claim Six alleging failure to protect

13

against Defendant Lind.

Defendants move for summary judgment on Plaintiff's remaining claims contending that, for Claim Three, Plaintiff failed to exhaust his available remedies and, in the alternative, Plaintiff fails state a viable claim for retaliation. For Claim Four, Defendants argue that Plaintiff cannot prove "but for" his filing a grievance against Muro, he would not have been transferred to LCF. For Claim Six, Defendants claim that Lind did not personally participate in the alleged violation and, in the alternative, Plaintiff cannot prove that he was incarcerated under conditions posing a substantial risk of serious harm nor that Lind was deliberately indifferent to Plaintiff's safety. Finally, Defendants assert that they are entitled to qualified immunity since the Plaintiff cannot prove the alleged constitutional violations and, if he could, the evidence shows that Defendants neither knew nor reasonably should have known that their conduct violated Plaintiff's rights.

Plaintiff responds that he properly completed the administrative grievance process and that no one at CDOC alerted him that his grievance may have been improper at the time it was filed, in contravention of AR 850-4(IV)(C)(1)(c)(2). He also asserts that he has stated a viable retaliation claim by alleging Muro placed him in segregation immediately following his statement to Muro that he was going to file a grievance against him. With respect to Claim Four, Plaintiff asserts that Defendants fail to rebut his assertion that he was summarily transferred to a facility that does not provide sex offender treatment only nine days after filing a grievance against Muro, because they have not produced the email that supposedly prompted DeGroot and Misel to execute the transfer and they have failed to demonstrate their proffered non-retaliatory reason for the transfer.

For Claim Six, Plaintiff argues that a genuine dispute of material fact exists as to Lind's participation, since he specifically met with Lind on March 24, 2008, the day before his move from

Unit 1 to Unit 5, at which time Lind told Plaintiff that Unit 1 was not to be used to house sex offenders.  Plaintiff alleges that the following day, he was ordered to pack and move and when he asked  why, he was told that Lind ordered the move.  Plaintiff also contends that, because he was threatened with physical harm by inmates who learned he was a sex offender, his placement in LCF Unit 2 posed a substantial risk of serious harm.  Further, Plaintiff asserts that Lind should have known of, and was deliberately indifferent to, the risk of harm because, after his family made complaints to CDOC headquarters concerning Plaintiff's safety at LCF, an Executive Assignment Order was issued on February 14, 2008 for Plaintiff's transfer from LCF to Sterling Correctional Facility.  Finally, Plaintiff argues that the facts as presented demonstrate genuine issues as to whether Defendants violated his constitutional rights, of which a reasonable person should have known.

## II.    LEGAL STANDARDS

### A.    Fed. R. Civ. P. 56

Summary judgment serves the purpose of testing whether a trial is required.  *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003).  The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that

15

the party is entitled to summary judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). However, the non-moving party has the burden of showing that there are issues of material fact to be determined. *Id.* at 324.

That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.") (emphasis in original) (citation omitted); *see also Hysten v. Burlington Northern & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

B.  <u>Treatment of a Pro Se Plaintiff's Pleadings</u>

A federal court must construe a *pro se* plaintiff's "pleadings liberally, applying a less stringent standard than is applicable to pleadings filed by lawyers. [The] court, however, will not supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory

on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (quotations and citations omitted).  In other words, "if the court can reasonably read the pleadings to state a valid claim on which the plaintiff could prevail, it should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  But, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant." *Id.*; *see also Peterson v. Shanks*, 149 F.3d 1140, 1143 (10th Cir. 1998) (citing *Dunn v. White*, 880 F.2d 1188, 1197 (10th Cir. 1989)).

## III.   ANALYSIS

The Defendants assert that they are entitled to qualified immunity on claims against them in their individual capacities.  Qualified immunity protects from litigation a public official whose possible violation of a plaintiff's civil rights was not clearly a violation at the time of the official's actions.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  It is an entitlement not to stand trial or face the other burdens of litigation.  *Ahmad v. Furlong,* 435 F.3d 1196, 1198 (10th Cir. 2006) (internal quotations and citations omitted).  The privilege is an immunity from suit rather than a mere defense to liability.  *Id.* When a defendant asserts the defense of qualified immunity at summary judgment, the burden shifts to the plaintiff to overcome the asserted immunity.  *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009).  "The plaintiff must demonstrate on the facts alleged both that the defendant violated his constitutional or statutory rights, and that the right was clearly established at the time of the alleged unlawful activity." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 818 (2009)).

The Supreme Court recently discarded a review process that required courts to examine these

questions sequentially, first considering whether a right had been violated, and then second - if the court concluded a right had been violated - whether that right was clearly established at the time of the alleged violation. *Pearson,* 129 S. Ct. at 816-22. *Pearson* retired this process, instead affording courts the discretion to decide "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* at 818; *see also Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1277 (10th Cir. 2009).

Here, in determining whether Plaintiff has met his burden of establishing constitutional violations that were clearly established, the Court construes the facts in the light most favorable to him as the non-moving party. *Scott*, 550 U.S. at 378. At summary judgment, the litigation is beyond the pleading phase; thus, a plaintiff's version of the facts must be supported by the record. *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). That is, "as with any motion for summary judgment, when opposing parties tell two different stories, one of which is blatantly contradicted by the record so that no reasonable jury could believe it, a court should not adopt that version of the facts." *Id.* (citations and quotations omitted).

Consequently, for each claim alleged, the Court will examine first whether the Plaintiff has demonstrated on supported facts that the Defendants violated his constitutional rights. If the Plaintiff has established sufficient facts to support a constitutional violation, the Court will then proceed to determine whether the right was clearly established at the time of the alleged conduct.

A.   <u>Claim Three</u>

Plaintiff claims that Muro retaliated against him by placing him in segregation for "threatening" to file a grievance against Muro. Defendants counter that Plaintiff failed to exhaust

this claim through the prison's administrative grievance procedure and, in the alternative, that a threat to file a grievance does not rise to the level of constitutionally protected activity.

1.      Exhaustion of Remedies

The Prison Litigation Reform Act requires a prisoner to exhaust available administrative remedies before suing over prison conditions. *See* 42 U.S.C. § 1997e(a); *see also Booth v. Churner,* 532 U.S. 731, 733 (2001). Because the prison's procedural requirements define the steps necessary for exhaustion, an inmate may only exhaust by properly following all of the steps laid out in the prison system's grievance procedure. *Jones v. Bock,* 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements ... that define the boundaries of proper exhaustion."); *see also Howard v. Waide*, 534 F.3d 1227, 1243-44 (10th Cir. 2008) ("Identifying the exact steps a prisoner must take to exhaust administrative remedies presents 'a choice-of-law issue,' derived from the requirements of 'the prison grievance systems themselves.'") (quoting from *Kikumura v. Osagie,* 461 F.3d 1269, 1282 (10th Cir. 2006), *overruled in part on other grounds as recognized in Robbins v. Oklahoma,* 519 F.3d 1242, 1246-47 (10th Cir. 2008)). If a facility fails to notify inmates of the requirements for the content of a grievance, "a grievance [will] satisf[y] § 1997e(a)'s exhaustion requirement so long as it provides prison officials with enough information to investigate and address the inmate's complaint internally." *Kikumura,* 461 F.3d at 1284.

Here, the CDOC Administrative Regulation ("AR") concerning its grievance procedure provides, in relevant part:

3.      Grievance Substance:

a.      Each grievance shall address only one problem or complaint and include a description of the relief requested. Problems that arise from the same incident or set of facts shall be grieved in one grievance even though it may involve multiple DOC employees, contract

workers or volunteers.

b.      A substantive issue may not be added at a later step if it has not been contained in each previous step of that particular grievance. All issues and remedies contained in the original grievance must be incorporated into each subsequent step of the grievance. Failure to renew each element of the complaint and/or requested relief in subsequent steps shall be deemed a waiver of those elements and/or requested remedy.

CDOC AR 850-04(IV)(B)(3).  This information certainly informs an inmate of the requirement to limit a grievance to one complaint or problem at a time, but it does not notify inmates exactly what content or information listed in the grievance is sufficient to satisfy exhaustion of the procedure. Therefore, in this instance, the Court will follow the tenets of *Kikumura*.

Defendants assert that Plaintiff failed to include in his Step 1 grievance any information concerning alleged "retaliation" by Officer Muro.  The Plaintiff admits as much and the Court agrees.  Plaintiff's September 11, 2007 Step 1 grievance is titled, "Staff Conduct, Harassment," and reflects Plaintiff's complaint that "Muro has been harassing me for the past two months. The harassment has culminated into my being placed into segregation on August 24, 2007."  Docket #156-1 at 17.  Plaintiff goes on to identify Muro's conduct that he finds "harassing," and mentions nothing about "retaliation" or Plaintiff being placed into segregation as a result of his alleged threat to file a grievance against Muro.  *Id.*

Defendants argue that even if Plaintiff's subsequent Step 2 and Step 3 grievances may be read to include allegations of retaliation by Muro, Plaintiff failed to properly exhaust his administrative remedies because he is not permitted to add a substantive issue that has not been contained in a previous step to the particular grievance.  *See* CDOC AR 850-04(IV)(B)(3)(b). Citing AR 850-04(IV)(C)(1)(c), Plaintiff responds that if his grievance were procedurally deficient, the

grievance officer was instructed to notify Plaintiff of the deficiency in response to the grievance.

First, the record demonstrates that, although Plaintiff may not have followed all steps of the CDOC's grievance process when he modified his allegations in Steps 2 and 3, the CDOC likewise appears to have failed to follow its regulation by not alerting Plaintiff at the Step 3 stage that his grievance was "inconsistent with a former step."   *See* AR 850-04(IV)(C)(1)(c)(2).   Rather, the CDOC specifically informed Plaintiff at Step 3 that he "ha[d] now exhausted [his] administrative remedies."  Docket #156-1 at 20; *see also* AR 850-04(IV)(C)(1)(c)(1) ("When a grievance is denied after a review of the *substantive* issues, the grievance officer shall certify in the response that the offender has exhausted the grievance process.") (emphasis added).   Because Defendants surely cannot succeed in the defense of failure to exhaust administrative remedies if the CDOC itself failed to follow administrative regulations for a grievance it claims is procedurally insufficient, the Court finds that an issue of material fact exists as to whether both Plaintiff and Defendants properly followed all of the steps laid out in the prison system's grievance procedure, the requirements of which define the boundaries of proper exhaustion.  *See Jones,* 549 U.S. at 218.

Moreover, consistent with *Kikumura*, the Court finds that the content of Plaintiff's Step 2 and Step 3 grievances suffices to provide the CDOC with enough information to investigate and address Plaintiff's allegations of retaliation.  Like Step 1, the Step 2 grievance is also titled, "Staff Conduct, Harassment," and incorporates the information provided in the Step 1 grievance.  Docket #156-1 at 18.  In it, the Plaintiff alleges in pertinent part, "The facts surrounding Muro's frivolous write up speak for themselves. He threatened to have me put in segregation to hinder my access to the courts, then followed through. Had there been any real merit to his claims, the investigating officer would have initiated formal charges. Instead, Muro's claims were thrown out."  *Id.*  In his

Step 3 grievance, Plaintiff alleges "Muro verbally threatened me for my legal action then followed through with a plainly meritless attempt at [a] conspiratorally [sic] planned disciplinary action that was soundly tossed out. ... I have been harassed and retaliated against for exercising my rights promised to me under the First Amendment of the United States Constitution." *Id.* at 19.  Plaintiff also cites several cases concerning retaliation, including a case standing for the proposition that "prison guards [are] prohibited from retaliation." *Id.*

Plaintiff's allegations, while not specifically asserting that he was placed in segregation following a threat to file a grievance, are sufficient to inform the CDOC that Plaintiff believed he suffered retaliation by Muro when he was placed in segregation.  Plaintiff alleges a protected activity, "legal action," an adverse action, "placement in segregation," and facts that, facially, suffice to raise an inference as to Muro's motivation, "frivolous write-up," and "Muro's claims were thrown out."  These allegations raise genuine issues of fact as to whether Defendants were sufficiently informed  to investigate and address Plaintiff's retaliation claim against Muro internally.  *See Kikumura,* 461 F.3d at 1284.

Accordingly, this Court recommends that the District Court find the Defendants have failed to demonstrate there are no issues of material fact concerning Plaintiff's exhaustion of administrative remedies, and deny their motion in this regard.

### 2.    Viability of Retaliation Claim

In the alternative, Defendants argue that Plaintiff cannot prove his retaliation claim because (a) threatening to file a grievance (as opposed to actually filing a grievance) is not protected activity, (b) placing the Plaintiff in segregation would not affect his ability to file grievances, and (c) there is no evidence of Muro's retaliatory motive.  Citing *Fogle v. Pierson*, 435 F.3d 1252 (10th Cir.

2006) and Judge Daniel's opinion denying the motion to dismiss Claim Three, Plaintiff counters that Defendants' argument that a "threat" is not protected activity "distorts this Circuit's view on the prison grievance process." Further, Plaintiff contends that material facts exist concerning Muro's motivation, in that during five other "incidents" concerning the Plaintiff, Muro did not issue disciplinary write-ups; however, in this instance, Plaintiff claims that Muro issued a write-up, which led to segregation, after Plaintiff "threatened" to file a grievance against him.

Plaintiff's claim is brought pursuant to 42 U.S.C. § 1983 alleging a First Amendment violation against non-employer government personnel. The Tenth Circuit has adopted a three-part test for such actions:

> Government retaliation against a plaintiff for exercising his or her First Amendment rights may be shown by proving the following elements: (1) that the plaintiff was engaged in constitutionally protected activity; (2) that the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct.

*Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007) (citing *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)).

### a. Protected Activity

The first element requires that the Plaintiff was engaged in constitutionally protected activity. Defendants argue that, even if it were true that Plaintiff told Muro he was going to file a grievance against him before Plaintiff was placed into segregation, a "threat" to file a grievance is not protected. Plaintiff counters that, pursuant to Judge Daniel's opinion and *Fogle v. Pierson, supra*, he states a viable protected action.

The Tenth Circuit has not yet ruled on whether a threat to file a grievance is protected activity under the First Amendment. In *Fogle*, the Tenth Circuit found that while the plaintiff's

allegations were unclear, the plaintiff nevertheless stated an arguable basis for his retaliation claim to the extent his alleged "complaints" about being placed in administrative segregation referred to internal prison appeals and/or formal grievances to prison officials.  435 F.3d at 1264.  The court concluded, "if in fact DOC officials retaliated against Fogle based on his *filing* administrative grievances, they may be liable for a violation of his constitutional rights."  *Id.* (emphasis added). Citing *Fogle* and other Tenth Circuit opinions, Judge Daniel has found "it is clearly established that prison officials cannot retaliate against a person *to prevent them* from exercising their right to file grievances or lawsuits, *i.e.*, that the prison officials are chilling the inmate's First Amendment rights."  *Rogers v. Garcia*, No. 08-cv-02821-WYD, 2010 WL 3547432, at *5 (D. Colo. Sept. 3, 2010) (unpublished) (emphasis added) (finding a plaintiff's report of sexual misconduct between prison staff and inmates, which resulted in the plaintiff's termination from a drug and alcohol program, to state a viable retaliation claim).  Furthermore, in ruling on Defendants' Motion to Dismiss in this case, Judge Daniel determined that the Plaintiff stated a viable retaliation claim against Muro by alleging that he had stated to Muro he was going to file a grievance against him, which could be inferred as the catalyst for initiating the process to place the Plaintiff in segregation. *See* docket #133 at 16 ("I agree with Plaintiff that this allegation falls squarely within the definition of retaliation in conjunction with the exercise of a constitutional right.").

At least one other court in this circuit has assumed without deciding that a threat to file a grievance is protected activity.  *See Strope v. Cummings*, No. 06-03021-KHV, 2008 WL 508698, at *6 (D. Kan. Feb. 22, 2008) (unpublished) (where the plaintiff alleged that retaliatory actions occurred immediately after his threat to file a grievance, he stated a viable retaliation claim). Moreover, other circuit courts have found that a threat to file a grievance constitutes protected

activity for purposes of a First Amendment retaliation claim. *See Ford v. Jones*, 149 F. App'x 316, 317 (5th Cir. 2005) (unpublished) (plaintiff's allegation that officials refused to provide him with a jacket or allow him to return to his cell as a result of his threat to file a grievance was sufficient to allege a violation of a constitutional right); *see also Pasley v. Conerly*, 345 F. App'x 981, 984-85 (6th Cir. 2009) (unpublished) (a prisoner's threat to file a legitimate grievance is protected conduct under the First Amendment). *But see Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009) (in dicta, the court states, "it seems implausible that a threat to file a grievance would itself constitute a First Amendment protected grievance.").

Nevertheless, Defendants contend that, even if the Court were to agree with the Plaintiff that he has stated an actionable protected activity, Muro would be entitled to qualified immunity because the stated right was not clearly established at the time of Plaintiff's threat.  The Court must agree.

Once a defense of qualified immunity is raised, the plaintiff must demonstrate that the law on which he relies was clearly established at the time of the defendant's action. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (a plaintiff must prove the right was sufficiently clear that a reasonable official would have understood that his conduct violated the right).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'" *Lymon v. Aramark Corp.*, 728 F. Supp. 2d 1222, 1250 (D.N.M. 2010) (quoting *Zweibon v. Mitchell,* 720 F.2d 162, 172-73 (D.C. Cir. 1983), *cert. denied,* 469 U.S. 880 (1984)).  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Currier v. Doran,* 242 F.3d 905, 923 (10th Cir. 2001) (citing *Medina v. City & Cnty.*

*of Denver*, 960 F2d 1493, 1498 (10th Cir. 1992), *overruled in part on other grounds*, *Williams v. City & Cnty. of Denver*, 99 F.3d 1009, 1014-15 (10th Cir. 1996)).

Here, as stated above, the Tenth Circuit has not addressed the question of whether a threat to file a grievance is protected activity under the First Amendment. This Court could find no Supreme Court authority on the subject. With respect to whether this Court may consider the opinions of the Fifth and Sixth Circuits, the Tenth Circuit has determined that courts may not rely upon unpublished decisions in determining whether law was clearly established. *Green v. Post*, 574 F.3d 1294, 1306 n.10 (10th Cir. 2009) (citing *Medina*, 960 F.2d at 1498-99)). Moreover, where circuit courts other than the Tenth Circuit may differ on a subject (*see Bridges, supra*), the law is not clearly established. *See Springer v. Albin*, No. 09-5088, 2010 WL 4027821, at *8 (10th Cir. Oct. 15, 2010) (unpublished) (finding disparity in other circuits and, thus, no clearly established law, as to whether an agent's alleged theft of money seized pursuant to a valid search violated the Fourth Amendment). As such, this Court finds the Plaintiff has failed to demonstrate that a threat to file a grievance constituted clearly established protected activity at the time he told Muro he would file the grievance.

b.    Adverse Action

Even if the District Court were to find Plaintiff's threat to file a grievance was clearly established protected activity under the First Amendment, this Court recommends that Defendants' motion be granted for Plaintiff's failure to establish an injury "that would chill a person of ordinary firmness from continuing to engage in the protected activity." *See Shero*, 510 F.3d at 1203.

Whether Defendants' actions caused Plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in the protected activity requires an objective, not

subjective, standard. *See Eaton v. Meneley*, 379 F.3d 949, 954-55 (10th Cir. 2004) ("[T]he objective standard permits a plaintiff who perseveres despite governmental interference to bring suit."); *see also Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) ("The focus, of course, is upon whether a *person of ordinary firmness* would be chilled, rather than whether the particular plaintiff is chilled.") (emphasis in original).

Here, Defendant Muro attests that "[g]rievances are frequently filed by CDOC inmates and inmates can continue to access and file grievances while they are in segregation." Muro Affidavit at ¶ 21; docket #156-2 at 3. Although Plaintiff states in his response brief that he sought and was denied grievance forms *before* the incident leading to his alleged threat to file a grievance against Muro (docket #164 at 8), Plaintiff fails to rebut Muro's testimony that he was able to access grievance forms and file grievances while in segregation. Moreover, although Plaintiff states that he was in segregation for nine days (docket #156-1 at 17), he provides no information as to the negative consequences, if any, he suffered as a result of his placement. Because there is no disputed fact that Plaintiff's placement into segregation for nine days did not restrict Plaintiff's ability to file a grievance (*i.e.*, access the courts) and there are no facts demonstrating how such placement would have chilled a person of ordinary firmness from filing (or threatening to file) grievances, the Plaintiff has failed to demonstrate on supported facts an action sufficiently adverse to constitute retaliation in violation of the First Amendment.

Consequently, this Court recommends that the District Court grant Defendants' motion for summary judgment on Claim Three seeking qualified immunity for Defendant Muro.

B.    Claim Four

Plaintiff claims that he was transferred from FCF to LCF on September 20, 2007 by his case

27

manager, Defendant DeGroot, in retaliation for filing a September 11, 2007 grievance against Muro.

He also asserts that DeGroot's supervisor, Defendant Misel, approved the transfer knowing that it

was in retaliation for filing the grievance against Muro.   Defendants seek qualified immunity

asserting (a) the transfer was not "regressive" as Plaintiff suggests, and (b) they transferred Plaintiff

for the legitimate penological interest of "encourag[ing] rehabilitation programs" and, thus, Plaintiff

cannot demonstrate that "but for" his grievance, the transfer would not have occurred.

As set forth above, the first element necessary to prove a claim for retaliation under the First

Amendment requires that the Plaintiff show he was engaged in a constitutionally protected activity.

Here, Defendants apparently concede that Plaintiff's filing of the September 11, 2007 grievance

constitutes a protected activity.

With respect to the second element—whether Defendants' actions caused Plaintiff to suffer

an injury that would chill a person of ordinary firmness from continuing to engage in the protected

activity—Defendants assert that the transfer from FCF to LCF was not "regressive," since LCF also

houses "close custody" inmates (like the Plaintiff).   The Court finds that Defendants' argument is

similar to the argument it proffered in response to Plaintiff's Motion for Partial Summary Judgment.

*See* docket #126.   Judge Daniel has already affirmed this Court's recommendation to deny the

motion finding that "whether LCF is harsher than FCF is a contested fact and cannot be resolved on

a motion for summary judgment."   Docket #143 at 6.

The third element requires that Plaintiff show Defendants' retaliatory motive was a "but for"

cause of Defendants' actions.   *Smith v. Maschner*, 899 F.2d 940, 949-50 (10th Cir. 1990).

Defendants contend that sex offenders rated "D" are not in compliance with the Sex Offender

Treatment and Management Program (SOTMP), and are customarily transferred from FCF (the main

facility to provide the SOTMP to CDOC inmates) to make room for other sex offenders on the wait list.  They offer evidence that four other "D" inmates were transferred from FCF during the same month that Plaintiff was transferred.  Docket #156-5 at 5-12.  Moreover, Defendant DeGroot claims that he completed the Reclassification Custody Rating form and recommended the transfer because he had received an email from Offender Services recommending that he do so due to Plaintiff's "S-5D" classification.  DeGroot Affidavit, ¶¶ 9-10, docket #156-4 at 2.  Further, Defendant Misel claims he did not know Corrections Officer Muro, and had no knowledge of the grievances filed by Plaintiff against Muro.  Misel Affidavit, ¶¶ 14-15, docket #156-6 at 3.

Plaintiff counters that, by Defendants' own admission, neither a copy of the email to DeGroot nor a policy from Offender Services regarding issuing lists of prisoners to be transferred exist.  Plaintiff's Declaration, ¶ 11, docket #164 at 22; Hollenbeck Affidavit, ¶¶ 4-5, docket #164 at 36-37.  Plaintiff attests that he was threatened with a transfer to LCF by DeGroot, and a few days after he turned in the grievance against Muro, he was moved to LCF.  Plaintiff's Declaration, ¶ 11. Plaintiff also attests that Misel reasonably should have known about his conflicts with DeGroot and Muro because Plaintiff attempted to notify him through the CDOC "kite" system, wherein Plaintiff sought help from Misel in obtaining a grievance form.  *Id.* at ¶¶ 12-13.

To defeat summary judgment, the Plaintiff must demonstrate a triable issue not only that retaliation for the grievance played a role in his transfer to LCF, but also that such retaliation was the decisive factor - that but for retaliation for the grievance he would not have been transferred. *Strope v. McKune*, 382 F. App'x 705, 710 (10th Cir. June 11, 2010) (unpublished).  In so doing, Plaintiff must offer evidence to undercut the factual basis of Defendants' explanation for his transfer. *Id.*  Temporal proximity between the protected activity and a challenged prison action does not, in

itself, demonstrate the causal nexus for a retaliation claim.  *Strope v. Cummings*, 381 F. App'x 878, 883 (10th Cir. June 9, 2010) (unpublished).

Here, the Plaintiff has alleged more than conclusory allegations of retaliation by Case Manager DeGroot; he has alleged specific facts demonstrating a genuine issue as to whether his transfer was motivated by retaliatory animus.  In addition to Defendants' admission that no policy nor copy of the email from Offender Services purportedly recommending Plaintiff's transfer exists, Plaintiff attests that DeGroot had previously threatened him with a transfer, then, only days after he filed a grievance against Muro, DeGroot transferred him specifically to LCF, a non-SOTMP facility. In support of his statement, Plaintiff refers to a document previously submitted in this case, a July 6, 2007 letter from Plaintiff to Warden Estep complaining about DeGroot's June 20, 2007 refusal to provide him with grievance forms and DeGroot's "threat" to transfer Plaintiff "out of this facility, then you will never attend the Phase 1 program" in response to Plaintiff's request for a grievance form to file a grievance against DeGroot.  *See* docket #117 at 22.[7]

In addition, Plaintiff contends that, while other inmates with a "D" classification also may have been transferred from FCF in September 2007, their transfers were handled differently.  For example, Plaintiff notes that none of the other inmates' case managers specified a facility location in recommending the inmate's transfer; however, DeGroot recommended specifically that Plaintiff be transferred to LCF.  *See* docket #156-4 at 5 compared with docket #156-5 at 5-16.  In 2007, LCF did not provide the SOTMP to inmates; rather, FCF was the main facility to provide the SOTMP to CDOC inmates.  *See supra* at ¶ 26; *see also* docket #156-6 at ¶ 12.

---

[7]This document was offered by the Plaintiff in support of his Motion for Partial Summary Judgment.  *See* docket #117.  Defendants have not challenged the authenticity of this letter.

Moreover, Plaintiff asserts that, unlike the other similarly situated inmates, his transfer was not referred to Offender Services.  *See* docket #156-4 at 5 compared with docket #156-5 at 5-12.[8] Defendant Misel attests that he did not seek an "additional review process by Offender Services prior to Mr. Conkleton's move, because Mr. Conkleton's move was routine and did not require any special approval."  However, of the seven transfer forms provided by Defendants for comparison to Plaintiff's, five were referred to Offender Services.  This fact is sufficient to raise a genuine issue as to whether Plaintiff's transfer was "routine" and whether approval by Offender Services is "special."

Finally, Plaintiff offers evidence that Defendant Misel has admitted "[t]here were close custody S-5D inmates at FCF who were not transferred."  *See* Defendant Misel's Response to Plaintiff's Request for Admissions, docket #117 at 38.

Considering Plaintiff's proffered evidence of DeGroot's alleged June 20, 2007 "threat" to transfer the Plaintiff to a non-SOTMP facility in response to Plaintiff's requests for grievance forms, the non-existence of documentary evidence of a recommendation by Offender Services to transfer the Plaintiff to LCF, and the fact that not all inmates who are in denial concerning the SOTMP are transferred out of FCF, as well as the inference from his lack of testimony that DeGroot knew about Plaintiff's grievance against Muro and the temporal proximity between the filing of Plaintiff's grievance against Muro and Plaintiff's transfer, the Court finds that Plaintiff has offered sufficient evidence to raise genuine disputes concerning the factual basis of Defendants' explanation for his

---

[8]The transfer form located at docket #156-5, p. 12, reflects no referral to Offender Services; however, the document is confusing in that the last comment by the supervisor, "still pending lateral facility movement," is dated *after* the accompanying Executive Assignment Order, which shows transfer to *four* different facilities.  *See* docket #156-5 at 11.

transfer for the "legitimate penological reason" of "encourag[ing] rehabilitation programs."

Thus, Plaintiff has stated a viable claim against DeGroot for retaliation in violation of the First Amendment. Furthermore, the law prohibiting transfer of inmates in retaliation for filing grievances was certainly "clearly established" at the time of the transfer. *See Smith*, 899 F.2d at 947 ("Prison officials may not retaliate against or harass an inmate because of the inmate's exercise of his right of access to the courts."); *see also Frazier v. Dubois*, 922 F.2d 560, 562-63 (10th Cir. 1990) ("prison officials do not have the discretion to punish an inmate for exercising his first amendment rights by transferring him to a different institution").

However, the Court finds the Plaintiff has failed to demonstrate a triable issue that but for Defendant Misel's retaliation for the grievance he would not have approved the transfer. It is well-settled that a defendant may not be held liable for constitutional violations merely because he or she holds a supervisory position. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996). "[A] supervisor's mere knowledge of his subordinate's [retaliatory] purpose [does not] amount to the supervisor's violating the Constitution." *Ashcroft v. Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949 (2009). "Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.*

Here, Misel attests that he neither knew Muro nor knew anything about Plaintiff's grievance filed against Muro. Misel Affidavit, ¶¶ 14-15. Plaintiff responds that Misel reasonably should have known about his conflicts with DeGroot and Muro because he attempted to notify him through the CDOC "kite" system, wherein Plaintiff sought help from Misel in obtaining a grievance form. Plaintiff's Declaration, ¶¶ 12-13. However, Plaintiff's only documentary evidence of this statement

32

is his July 6, 2007 letter to Warden Estep in which he asserts: "On June 21 and 27, 2007, I 'kited'

Case Mgr T. Mizel [sic] – I was told by staff that Mizel [sic] was the acting C/M supervisor – to

inform him that I needed either an interview or a grievance form for a case manager. No response

has been received." Docket #117 at 22. Plaintiff's complaint about Misel to Estep occurred well

before the incident at issue concerning Muro, and Plaintiff provides no other evidence rebutting

Misel's testimony that he knew nothing about Plaintiff's grievance against Muro. Because Plaintiff

has failed to show genuine issues of fact demonstrating that Misel, by his own misconduct, violated

the First Amendment by retaliating against Plaintiff for filing a grievance against Muro, the Court

finds that Plaintiff has failed to state a viable constitutional claim against Misel.

Consequently, the Court recommends that the District Court grant Defendants' motion for

summary judgment on Claim Four seeking qualified immunity for Misel and deny Defendants'

motion seeking qualified immunity for DeGroot.

C.    Claim Six

Plaintiff asserts that Defendant Lind was deliberately indifferent to his safety when he

ordered Plaintiff to be moved from Unit 1 to Unit 5 at LCF knowing that Plaintiff had received

threats from other inmates because of his classification as a sex offender. Defendants counter that

Lind did not personally participate in the move and, in the alternative, Plaintiff cannot prove his

Eighth Amendment claim because he did not suffer conditions posing a substantial risk of serious

harm and Lind was not deliberately indifferent to the Plaintiff's safety.

1.    Personal Participation

"Individual liability under § 1983 must be based on personal involvement in the alleged

constitutional violation." *Foote v. Spiegel,* 118 F.3d 1416, 1423 (10th Cir. 1997). Supervisory

status alone does not create § 1983 liability. *Duffield v. Jackson,* 545 F.3d 1234, 1239 (10th Cir. 2008). Rather, there must be "an affirmative link ... between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Green v. Branson,* 108 F.3d 1296, 1302 (10th Cir. 1997) (quotation marks and brackets omitted).

The parties stipulate that, at all relevant times, Defendant Lind was the Custody and Control Manager at LCF and Lt. Anthony Piper was the Internal Classification Officer whose job duties included handling new inmate arrivals, placement and movement.  Lind attests that his job duties did not include determining specific housing unit assignments for inmates.  Lind Affidavit, ¶ 4, docket #156-7.  Lind claims he does not have any specific recollection of the Plaintiff and has no recollection of any interactions with him, or of his allegations against him in this action.  *Id.* at ¶ 5. In addition, Lind asserts he has no recollection of any conversation with Plaintiff or with any other prisoner at LCF concerning Unit 1 being used to protect sex offenders.  *Id.* at ¶ 6.

Defendants provide a copy of a "movement history" report for the Plaintiff.  *See* "Query Movements" report, Docket #156-5 at 19.   The report reflects that on September 25, 2007, Plaintiff was transferred from FCF to LCF.  *Id.*  That same day, Plaintiff was moved from LCF Intake to LCF Unit 1.  *Id.*  Plaintiff was then moved from LCF Unit 1 to LCF Unit 2 on October 2, 2007.  *Id.* Plaintiff claims that in the morning on February 6, 2008, Plaintiff personally spoke with Piper about threats of physical assault he was receiving from inmates in Unit 2 and Piper told Plaintiff to move from Unit 2 to Unit 1 that day.  Plaintiff's Declaration, ¶¶ 15, 17.  The movement history report reflects that on February 6, 2008, Plaintiff was moved from LCF Unit 2 back to LCF Unit 1.  Docket #156-5 at 19.  Eight days later, on February 14, 2008, an Executive Assignment Order was issued

34

for Plaintiff's transfer from LCF to Sterling Correctional Facility ("SCF"); however, the transfer did not take place at that time. *See* docket #164 at 32.

Plaintiff claims that on March 24, 2008, Lind summoned Plaintiff to his office and told Plaintiff that Unit 1 was not going to be used to house sex offenders and that Plaintiff was going to be moved the next day to another unit. Plaintiff's Declaration, ¶ 14. Plaintiff asserts that the next day, March 25, 2008, he was ordered to pack and move to Unit 5 from Unit 1. *Id.* at ¶ 16. When Plaintiff refused to move, he was taken first to medical, then to segregation that same day. *See* Incident #191990 Report, filed by James Green, docket #164 at 33. The movement history report reflects that on March 25, 2008, Plaintiff was placed in segregation, then on March 31, 2008, Plaintiff was moved from LCF to the Sterling Correctional Facility. Docket #156-5 at 19.

The Court finds that Plaintiff's version of the events surrounding the move between LCF units is supported by the record. *See Thomson*, 584 F.3d at 1312. Although Lind attests that he has no recollection of speaking with the Plaintiff, Plaintiff attests that he personally spoke with Lind in his office and was ordered to move the next day. Moreover, Lind claims that he recalls nothing about issues concerning inmate threats against the Plaintiff; however, Plaintiff claims that Piper moved the Plaintiff from Unit 2 back to Unit 1 after he complained about the threats in February 2008. Just days later, Plaintiff was slated to transfer from LCF to another facility. The documentary record supports Plaintiff's claims. Therefore, the Court recommends finding that Plaintiff has demonstrated on supported facts genuine issues as to whether Lind personally participated in the order to move from LCF Unit 1 to LCF Unit 5.

2.     Deliberate Indifference to Substantial Risk of Serious Harm

Under the Eighth Amendment, prisoners are constitutionally entitled to "humane conditions

of confinement guided by 'contemporary standards of decency.'" *Penrod v. Zavaras,* 94 F.3d 1399, 1405 (10th Cir. 1996) (quoting *Estelle v. Gamble,* 429 U.S. 97, 103 (1976)).  Accordingly, prison officials must "ensur[e] inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and . . . tak[e] reasonable measures to guarantee the inmates' safety."  *Barney v. Pulsipher,* 143 F.3d 1299, 1310 (10th Cir. 1998) (citing *Farmer v. Brennan,* 511 U.S. 825, 832-33 (1994)).  Prisoners state a claim of cruel and unusual punishment under the Eighth Amendment by alleging prison officials demonstrated "deliberate indifference to a prisoner's serious illness or injury," or that prison officials "have, with deliberate indifference," involuntarily exposed a prisoner to conditions "that pose an unreasonable risk of serious damage to [the inmate's] future health."  *Helling v. McKinney,* 509 U.S. 25, 35 (1993); *see also Estelle,* 429 U.S. at 105.

"To establish a cognizable Eighth Amendment claim for failure to protect, a plaintiff 'must show that he is incarcerated under conditions posing a substantial risk of serious harm,' the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component."  *Verdicia v. Adams*, 327 F.3d 1171, 1175 (10th Cir. 2003) (quoting *Benefield v. McDowall*, 241 F.3d 1267, 1271 (10th Cir. 2001)).  Plaintiff must meet both the objective and subjective components.  *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006).  The objective component is met "if the harm suffered is 'sufficiently serious' to implicate the Cruel and Unusual Punishment Clause."  *Id.* (quoting *Kikumura*, 461 F.3d at 1291).

To meet the subjective component, a plaintiff must demonstrate defendants "knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it."  *Callahan*, 471 F.3d at 1159 (quoting *Kikumura*, 461 F.3d at 1293).  The subjective component requires an "inquiry into a prison official's state of mind when it is claimed that the official has

36

inflicted cruel and unusual punishment." *Kikumura*, 461 F.3d at 1293 (quoting *Farmer*, 511 U.S. at 838). This component is equivalent to "criminal recklessness, which makes a person liable when she [or he] consciously disregards a substantial risk of harm." *Beauclair v. Graves*, 227 F. App'x 773, 776 (10th Cir. 2007) (unpublished) (quoting *Mata v. Saiz*, 427 F.3d 745, 752 (10th Cir. 2005)).

###### a.   Did Conditions Pose Substantial Risk of Serious Harm?

Plaintiff contends that "being identified as a sex offender in Limon Correctional Facility is a condition that poses a substantial risk of serious harm," since the facility did not, at the time, offer a sex offender treatment program and, thus, fewer sex offenders would have been housed there. Plaintiff attests that shortly before February 6, 2008, he had received threats of physical assault from inmates in Unit 2. Plaintiff's Declaration, ¶ 17. "A prisoner has a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates." *Riddle v. Mondragon*, 83 F.3d 1197, 1204 (10th Cir. 1996) (citation omitted). After complaining to Lt. Piper, Plaintiff was moved out of Unit 2 to Unit 1, which is consistent with CDOC's policy: "If it is determined there is an actual threat to the inmate's safety, Piper and other CDOC staff members are trained to write a report and to take appropriate steps in an attempt to protect the inmate. These steps include separating the inmate from the other inmate(s) who is believed to pose a danger, initiating disciplinary charges if warranted, and/or moving the inmate being threatened so as to prevent the inmates from having contact with one another." Piper Affidavit, ¶ 10. On these facts, the Plaintiff has raised an inference that conditions in LCF Unit 2 posed a substantial risk of serious harm to him.

However, the Plaintiff fails to demonstrate on supported facts that conditions in LCF Unit 5 would pose a risk of harm. The mere fear of physical assaults by inmates who may discover that Plaintiff was charged with a sex offense is insufficient to constitute a substantial risk of serious harm

under the Eighth Amendment.  *See Riddle*, 83 F.3d at 1205.  Plaintiff provides no evidence raising

an inference that Unit 5 was any more dangerous than Unit 1; in fact, the parties stipulate that the

CDOC does not have protective custody for sex offenders or for any inmates, and that sex offenders

are housed amongst the general population in all CDOC facilities.

Plaintiff's proffered evidence fails to support his claim.  The affidavit of a fellow inmate,

Jerry Weir, reflects that he, a sex offender, had been subjected to "threats and harassment" at LCF,

but there is no indication Mr. Weir was ever housed in Unit 5.  *See* docket #164 at 24-26.  Moreover,

the news article concerning the killing of a sex offender reflects that the killing took place at a

"Territorial" facility in Canon City, not at the LCF.  *Id.* at 31.  Finally, Plaintiff offers no evidence

that other sex offenders suffered threats or physical assaults in Unit 5.  *See Smith v. Cummings*, 445

F.3d 1254, 1258 (10th Cir. 2006) (where plaintiff was not harmed, there was no evidence of harm

to other inmates under the circumstances and prison officials took precautions to prevent harm,

summary judgment was appropriate on the ground that there was no substantial risk of harm).

In addition, the Court finds compelling the parties' stipulation that Plaintiff was never housed

in Unit 5 at LCF.  Rather, he was placed in segregation on March 25, 2008, then transferred to the

Sterling Correctional Facility on March 31, 2008.  Thus, Plaintiff was never actually placed in

conditions that may have exposed him to harm as a result of the order to move to Unit 5, which was

allegedly made by Lind.  *See Babcock v. White*, 102 F.3d 267, 273 (7th Cir. 1996) (acknowledging

pursuant to *Farmer* that an actual assault need not occur for an Eighth Amendment violation, but

finding that the plaintiff, who had been previously attacked by members of the "Mexican Mafia,"

did not state a compensable Eighth Amendment injury where he refused an order to be placed in the

general population with suspected mafia members, remained in detention for ten months, then was

transferred to another facility)[9]; *see also Villarreal v. Harrison*, No. 99-1268, 201 F.3d 449, 1999 WL 1063830, at *3 (10th Cir. Nov. 23, 1999) (unpublished) (finding no Eighth Amendment violation by a prison official who classified an inmate as a suspected gang member, noting that there was no evidence the plaintiff was actually harmed by other inmates as a result of the classification); *Gann v. Schriro*, No. CV 08-8017, 2009 WL 3837186, at *9 (D. Ariz. Nov. 16, 2009) (unpublished) (finding that the plaintiff failed to satisfy the objective requirement of an Eighth Amendment claim where, after being allegedly threatened, the plaintiff sex offender was ordered to move back into general population, he refused the order and remained in detention; thus, he was not placed into a situation that posed a substantial risk of serious harm).

b.      Was Lind Deliberately Indifferent?

"Deliberate indifference requires more than a showing of simple or heightened negligence." *Verdecia,* 327 F.3d at 1175.  A plaintiff "must do more than establish that [the defendant] should have known of the risk of harm." *Id.*  He "[m]ust present evidence supporting an inference that [the defendant] actually knew about a substantial risk of serious harm to his safety." *Id.*  "Deliberate indifference requires that the defendant's conduct is in disregard of a known or obvious risk that was so great as to make it highly probable that harm would follow or that the conduct disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Id.* at 1175-17 (internal quotations omitted).

---

[9]The Tenth Circuit in *Benefield v. McDowall*, 241 F.3d 1267 (10th Cir. 2001), declined to follow the general proposition from *Babcock* that "a psychological injury caused by living in fear of other inmates is not compensable under the Eighth Amendment." *Id.* at 1272.  However, the court in *Benefield* did not distinguish its alleged facts – that the defendant placed the plaintiff at risk by identifying him to other inmates as a snitch – from the facts in *Babcock* that the plaintiff was never placed at risk of the assault(s) he feared.

Here, the Plaintiff has failed to establish genuine issues as to whether Unit 5 posed a substantial risk of serious harm; thus, even if true that Lind ordered the March 25, 2008 move to Unit 5, he cannot be said to have "disregard[ed] a known or obvious risk that is very likely to result" in threats to or physical assault upon the Plaintiff.[10]  The Court concludes that Plaintiff has failed to demonstrate issues of material fact as to whether Lind violated his Eighth Amendment right to be free from cruel and unusual punishment.

Consequently, this Court recommends that the District Court grant Defendants' motion for summary judgment on Claim Six seeking qualified immunity for Lind.

## IV.     CONCLUSION

The Plaintiff has failed to demonstrate genuine issues of material fact as to whether Muro violated his First Amendment right against retaliation as set forth in Claim Three, whether Misel violated his First Amendment right against retaliation as set forth in Claim Four, and whether Lind violated his Eighth Amendment right against cruel and unusual punishment as set forth in Claim Six. Therefore, Muro, Misel and Lind are entitled to qualified immunity from the claims raised against them.  However, Plaintiff has raised issues of fact that cannot be resolved on summary judgment with respect to whether DeGroot violated his First Amendment right against retaliation as set forth in Claim Four; thus, DeGroot is not entitled to qualified immunity and this Court recommends that the case proceed to trial on Plaintiff's partial Claim Four against DeGroot.

Accordingly, the Court respectfully RECOMMENDS that Defendants' Motion for Summary Judgment [filed August 25, 2010; docket #156] be **GRANTED IN PART** as to Claims Three and

---

[10]On the other hand, if the Plaintiff had alleged that Lind had ordered a move back to Unit 2, then genuine issues may exist raising an inference that Lind, had he known about the previous threats and Plaintiff's move from Unit 2 to Unit 1, may have disregarded a known or obvious risk.

Six, and as to Claim Four against Misel, and **DENIED IN PART** as to Claim Four against DeGroot.

Dated at Denver, Colorado, this 31st day of January, 2011.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge